IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


JACQUELINE LONG                      )
                                     )
v.                                   )        NO. 3:10-0273
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security      )


To: The Honorable Thomas A. Wiseman, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform a limited range of light work during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 13) should be denied.

# I. INTRODUCTION

The plaintiff filed applications for DIB and SSI on October 30, 2007, alleging a disability onset date of May 1, 2005, which she amended at the hearing to April 1, 2007,[1] due to a right upper congenital extremity deficiency, bipolar disorder, and anxiety disorder. (Tr. 33, 60-66.)  The plaintiff's date last insured is June 30, 2009. (Tr. 60-66.)  Her applications were denied initially and upon reconsideration. (Tr. 75, 84-87.)  A hearing before Administrative Law Judge ("ALJ") Linda Gail Roberts was held on July 30, 2009. (Tr. 21-57.)  The ALJ delivered an unfavorable decision on August 24, 2009 (tr. 10-20), and the plaintiff sought review of that decision before the Appeals Council. (Tr. 5-6.)  On January 22, 2010, the Appeals Council denied the plaintiff's request for review (tr. 1-4), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on January 1, 1986, and was 21 years old on her amended alleged disability onset date of April 1, 2007. (Tr. 27.) She completed the ninth grade (tr. 27, 156), and her past jobs include employment as a cashier and a cook's helper. (Tr. 27-28, 171.)

---

[1] The plaintiff filed applications for SSI on May 4, 2005 (tr. 58) and on November 9, 2006 (tr. 59), but she "waived" these applications at her hearing, since she had engaged in substantial gainful activity by working at Wal-Mart in 2006 and 2007. (Tr. 33-34.)

### A. Chronological Background: Procedural Developments and Medical Records

The plaintiff was born with a congenital right upper extremity deficiency, specifically with no right hand or arm below the elbow. (Tr. 219, 295.)

The plaintiff presented to Centerstone Mental Health Center ("Centerstone") on February 6, 2002, for social, family, and depression/mood disorder problems. (Tr. 349.) Between February of 2002, and November of 2002, she attended counseling sessions at Centerstone, was diagnosed with depressive and conduct disorder, was found to have a "serious emotional disturbance," and was assigned Global Assessment of Functioning ("GAF") scores of 45[2] and 50. (Tr. 298-350.)

On June 1, 2005, the plaintiff presented to Dr. David Luck, a family practitioner, with complaints of a sore throat and cough, and he diagnosed her with acute bronchitis and bipolar disorder and prescribed Symbyax.[3] (Tr. 401.) On December 8, 2005, Dr. Roy Johnson, a Disability Determination Services ("DDS") physician, conducted a consultative examination (tr. 351-52) and opined that the plaintiff could occasionally lift five pounds with her left arm and that her ability to sit/stand was not restricted. (Tr. 352.) Between July

---

[2] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score of 41-50 falls within the range of "[s]erious symptoms [or] any serious impairment in social, occupational, or school functioning." Id.

[3] Symbyax is prescribed to treat depressive episode associated with bipolar disorder. Physicians Desk Reference 1965 (64th ed. 2010) ("PDR").

and November of 2006, Dr. Luck examined the plaintiff on several occasions; diagnosed her with insomnia, bipolar disorder, weight loss, and back and knee pain; and prescribed Remeron Soltab,[4] Lexapro,[5] and Celexa.[6] (Tr. 396-400.)

On February 26, 2007, Dr. Dorothy Lambert, Ph.D., a consultative DDS examiner, conducted a psychological evaluation (tr. 285-89) and noted that the plaintiff was fully oriented, articulate, and cooperative but that her mood and affect were anxious. (Tr. 286.) Dr. Lambert opined that the plaintiff was slightly impaired in her ability to understand and remember "short, work-like procedures and locations;" moderately impaired in her concentration, persistence, and ability to react to changes; and severely impaired in her ability to interact with others. (Tr. 288.) She diagnosed the plaintiff with bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), and panic disorder without agoraphobia and assigned her a GAF score of 55.[7] (Tr. 289.)

On March 14, 2007, Dr. William Meneese, Ph.D., a non-examining consultative DDS examiner, completed a Psychiatric Review Technique Form ("PRTF") (tr. 355-68) and listed

---

[4]Remeron Soltab is used in the treatment of major depressive disorder. PDR at 3219.

[5]Lexapro is prescribed for major depressive disorder and generalized anxiety disorder. PDR at 1160-61.

[6]Celexa is indicated for the treatment of depression. PDR at 1153-54.

[7]A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34.

the plaintiff's diagnoses as ADHD, bipolar disorder, panic disorder without agoraphobia, personality disorder not otherwise specified ("NOS"), and "polysubstance dependence in remission."[8] (Tr. 356, 358, 360, 362-63.)  He opined that the plaintiff was mildly limited in her activities of daily living, moderately limited in her ability to maintain social functioning, concentration, persistence, and pace, and had experienced no episodes of decompensation. (Tr. 365.)

Dr. Meneese also completed a mental residual functional capacity assessment ("RFC") (tr. 369-72) and determined that the plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; "to maintain attention and concentration for extended periods of time;" "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" "to work in coordination with or proximity to others without being distracted by them;" "to complete a normal workday and workweek;" "to interact appropriately with the general public;" "to accept instructions and respond appropriately to criticism from supervisors;" "to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;" "to respond appropriately to changes in the work setting;" and "to set realistic goals or make plans independently of others." (Tr. 369-70.)   He also noted that the plaintiff is able to maintain her attention and complete tasks without needing "special supervision" or

_____

[8] It does not appear that there is any indication in the record to suggest that the plaintiff ever abused drugs or alcohol.

requiring "more than usual customary breaks," but that she needs "a flexible daily schedule and a well-spaced work setting," "tactful and supportive" supervision, work expectations to be introduced gradually, and assistance with work goals that are long-term and complex. (Tr. 371.)

On March 20, 2007, Dr. James Moore, a non-examining consultative DDS examiner, completed a physical RFC (tr. 373-80) and opined that the plaintiff could occasionally lift/carry 20 pounds, could frequently lift/carry 10 pounds, and could sit/stand/walk about six hours in an eight-hour work day. (Tr. 374.) He found that the plaintiff was unlimited in her ability to push/pull (*id.*), that she should never climb ladders, rope, or scaffolding (tr. 375), and that the plaintiff could not reach, handle, finger, or feel with her right upper extremity but had no such limitations with her left upper extremity. (Tr. 376.) Dr. Moore also noted, without further explanation, that the plaintiff's "symptoms are partially credible" and that although she has a right arm deformity, her "left upper extremity functions normally." (Tr. 378.)

On May 29, 2007, the plaintiff presented to Dr. Luck and he diagnosed her with left knee pain, Achilles tendonitis, right scapula pain, and lumbar pain. (Tr. 395.) Dr. Luck ordered an x-ray of the plaintiff's left knee and lumbar spine, which were both normal. (Tr. 406-07.) Between June and November of 2007, Dr. Luck examined the plaintiff on multiple occasions; diagnosed her with abdominal pain, insomnia, bipolar disorder, neck

pain, traumatic anxiety, and synovitis; and prescribed Zantac,[9] Lexapro, Effexor,[10] and Valium.[11] (Tr. 387- 94.)

On October 17, 2007, Dr. Luck completed a physical RFC and a Listing 12.04 form. (Tr. 381-85.)  In the physical RFC, he diagnosed the plaintiff with depression, bipolar disorder, anxiety, and manic syndrome; noted that she was unable to use her right arm; and opined that she could walk ten to twelve blocks without rest or pain and that she could sit/stand/walk for eight hours in an eight-hour work day. (Tr. 381-83.)  Dr. Luck found that the plaintiff needs to be able to "sit in a recliner or lie down" for one hour in an eight-hour workday, that she does not need a job that allows her to shift from sitting/standing/walking at will or to take unscheduled breaks, that she should never lift or carry anything, and that she will likely miss work "[m]ore than four times a month." (Tr. 381-82.)

Dr. Luck noted in the Listing 12.04 form that the plaintiff's depression was characterized by "[a]nhedonia or pervasive loss of interest in almost all activities," appetite and sleep disturbance, "[p]sychomotor agitation or retardation," "[d]ecreased energy," "[f]eelings of guilt or worthlessness," and "[d]ifficulty concentrating or thinking;" that her manic syndrome was characterized by hyperactivity, "[p]ressure of speech," "[f]light of

---

[9] Zantac is prescribed for gastroesophageal reflux disease ("GERD"). PDR at 1738-39.

[10] Effexor is prescribed for the treatment of major depressive disorder. PDR at 3505.

[11] Valium is a benzodiazepine sedative and skeletal muscle relaxant. Saunders Pharmaceutical Word Book 745 (2009) ("Saunders").

ideas," and being distracted easily; and that she has "[b]ipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndrome." (Tr. 384.) Dr. Luck also opined that she was markedly limited in her activities of daily living, in her ability to maintain social functioning, and in her ability to maintain concentration, persistence and pace, and found that she had "4+" repeated episodes of decompensation. *Id.*

On December 28, 2007, Dr. Michael Ryan, a non-examining consultative DDS physician, completed a physical RFC (tr. 414-21) and found that the plaintiff could occasionally lift/carry 20 pounds, could frequently lift/carry 10 pounds, could stand/walk/sit about six hours in an eight-hour work day, and had unlimited ability to push/pull. (Tr. 415.) He determined that the plaintiff should never climb a ladder, rope, or scaffolding, and could not handle, finger, or feel with her right upper extremity but had no such limitations with her left upper extremity. (Tr. 416-17.)

On January 18, 2008, Dr. Rebecca Joslin, Ed.D., a non-examining consultative DDS examiner, completed a PRTF and mental RFC (tr. 422-38) and diagnosed the plaintiff with bipolar disorder, panic disorder, and a history of ADHD. (Tr. 423-24,427.) Dr. Joslin opined that the plaintiff was mildly limited in her activities of daily living and moderately limited in her ability to maintain social functioning, concentration, persistence, and pace, but had experienced no episodes of decompensation. (Tr. 432.) Dr. Joslin also found that the

plaintiff was moderately limited in her ability "to maintain attention and concentration for extended periods of time;" "to complete a normal workday and workweek;" "to accept instructions and respond appropriately to criticism from supervisors;" "to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;" and "to respond appropriately to changes in the work setting." (Tr. 436-37.) She also concluded that the plaintiff was markedly limited in her ability "to interact appropriately with the general public." (Tr. 437.)

Between January of 2008, and May of 2008, Dr. Luck examined the plaintiff on multiple occasions; diagnosed her with ADHD, bipolar disorder, a panic attack,[12] and abdominal pain; and prescribed Adderall,[13] Lithium,[14] Lexapro, and Lortab.[15] (Tr. 499-505.)

On May 1, 2008, the plaintiff presented to Volunteer Behavioral Health Care System ("VBHCS") and was diagnosed with ADHD, anxiety disorder, and bipolar disorder, and was assigned a GAF score of 55. (Tr. 450-54.) The plaintiff returned to VBHCS several times in May and June of 2008 and was diagnosed with ADHD, anxiety disorder, and

---

[12] Dr. Luck provided no details of the panic attack. (Tr. 502.)

[13] Adderall is used to treat ADHD. Saunders at 12.

[14] Lithium is an anti-psychotic used to treat manic episodes of bipolar disorder. Saunders at 411.

[15] Lortab is prescribed for the relief of moderate to moderately severe pain. PDR at 3143.

bipolar disorder, was assigned a GAF score of 55, and was prescribed Seroquel,[16] Adderall, and Cogentin.[17] (Tr. 455-58, 463-66.) On June 10, 2008, the plaintiff reported that her mood was improved and that she was less irritable. (Tr. 457) Between June of 2008, and January of 2009, the plaintiff occasionally met with her VBHCS case manager (tr. 471, 477-78, 480) but also canceled or missed multiple appointments (tr.467-70, 472, 482-83, 485), and her therapy was not changed since "no risk factors [were] present to warrant a change in service intensity." (Tr. 484.) On June 15, 2009, the plaintiff returned to VBHCS and reported she was "starting to have anxiety and mood swings" (tr. 459) but that her symptoms were mild and did not "particularly interfer[e]" with her ability to function. (Tr. 445.) The plaintiff denied having any psychotic symptoms, was diagnosed with ADHD, anxiety disorder NOS, and bipolar disorder, and was assigned a GAF score of 60. (Tr. 459-60, 487.)

From June to December of 2008, the plaintiff presented to Dr. Luck on several occasions and he diagnosed her with right shoulder pain, abdominal pain, and anxiety, and

---

[16] Seroquel is used to treat bipolar disorder and schizophrenia. PDR at 751.

[17] Cogentin is an anticholinergic that is used to control tremors and muscle stiffness. Saunders at 175.

prescribed Tylenol, Levaquin,[18] Lortab, Flexeril,[19] Vistaril,[20] Nasonex,[21] and a Z-pack. (Tr. 492-98.) A June 8, 2009, x-ray of the plaintiff's right shoulder was normal. (Tr. 506.)

On June 17, 2009, Dr. Luck examined the plaintiff and diagnosed her with right shoulder pain and bipolar disorder. (Tr. 491.) He also completed a mental Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") (Tr. 488-89) and opined that the plaintiff was extremely limited in her ability "to make judgments on complex work-related decisions;" was markedly limited in her ability to make judgments on simple work-related decisions, in her ability to understand, remember, and carry out complex instructions, in her ability to interact appropriately with supervisors, co-workers, and the public, and in her ability to respond appropriately "to usual work situations and to changes in a routine work setting;" and was mildly limited in her ability to understand, remember, and carry out simple instructions. *Id.*

---

[18] Levaquin is used to treat or prevent infections caused by susceptible bacteria. PDR at 2630.

[19] Flexeril is a skeletal muscle relaxant. Saunders at 294.

[20] Vistaril is a "minor tranquilizer." Saunders at 758.

[21] Nasonex is a nasal spray used to treat allergies. Saunders at 481.

**B. Hearing Testimony: The Plaintiff and a Vocational Expert**

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and Michelle McBroom-Weiss, a Vocational Expert ("VE"), testified. (Tr. 21-57.) The plaintiff testified that she completed the ninth grade (tr. 27), and that she had worked as a cashier for Wal-Mart and Captain D's and in 2008, as an "expeditor"[22] at Olive Garden for one to two months.[23] (Tr. 29-30, 53.) She testified that her employment at Olive Garden ended because she "went off" of her medication and became depressed. (Tr. 30.) The plaintiff testified that Dr. Luck had been her "primary caregiver" for her physical and mental impairments on a monthly basis since she was 18 years old. (Tr. 32.)

The plaintiff reported that she attempted to complete the GED program on three occasions, two of those while on medication, but that she could not complete the program because she had difficulty with math, science, and reading. (Tr. 42-43.) She also testified that although she was able to read the driver's license examination, she failed to get her license because she could not "focus or concentrate" while taking the test. (Tr. 43-44.)

The VE testified that the plaintiff would be classified as a younger individual at the time of her alleged onset date and at the time of her hearing. (Tr. 41.) The VE classified the

---

[22] This job was also described as a cook's helper (tr. 53), and the plaintiff explained that she was required to put plates on a tray and "some silverware" on the plates, and "sometimes" to "wip[e] down counters." (Tr. 29, 44.)

[23] During that one to two month period, the plaintiff's total wages from Olive Garden were $359.37. (Tr. 29, 137.)

plaintiff's past work as a cook's helper as light and unskilled work and her past work as a cashier as light and semi-skilled, and she explained that the "closest match" that she could make to the plaintiff's work at Olive Garden was that of a food assembler, which she classified as light and semi-skilled. (Tr. 41, 45.)

The ALJ asked the VE to consider Dr. Johnson's medical findings and the work that the plaintiff would be able to perform, and the VE responded that she would be able to perform less than sedentary work and thus would be precluded from performing any work. (Tr. 46.) Next, the ALJ asked the VE to review Dr. Luck's physical RFC and Listing 12.04 form and the work that the plaintiff would be able to perform, and the VE related that she would be precluded from working. *Id.* The ALJ then asked the VE to consider Dr. Ryan's physical RFC and the work that the plaintiff would be able to perform, and the VE replied that she could perform both of her past jobs. (Tr. 47.) Next, the ALJ asked the VE to review Dr. Joslin's PRTF and the work that the plaintiff would be able to perform, and the VE responded that the plaintiff could do her past work as a cook's helper but not as a cashier because "it was with the public, and [the plaintiff had] marked limitations with the public." *Id.*

The ALJ then asked the VE to consider what type of work the plaintiff could perform if she combined the mental and physical assessments of different evaluators. First, the ALJ asked the VE to consider Dr. Joslin's PRTF with Dr. Johnson's medical findings and

Dr. Joslin's PRTF with Dr. Luck's physical RFC, and the VE responded that in both scenarios the plaintiff would be precluded from working. (Tr. 48.) Next, the ALJ asked the VE to review Dr. Joslin's PRTF and Dr. Ryan's physical RFC and the work that the plaintiff could perform, and the VE answered that she could do her past work as a cook's helper but not as a cashier and that she could work as a security systems monitor, garment sorter, and sorter in a production environment. (Tr. 49-50.)

The ALJ then asked the VE to review Dr. Meneese's mental RFC and the work that the plaintiff could perform, and the VE replied that she would be able to perform her past relevant work. (Tr. 51.) Next, the ALJ asked the VE to consider Dr. Meneese's mental RFC and Dr. Moore's physical RFC and the work that the plaintiff could perform, and the VE responded that she could do both of her past jobs. *Id.* The ALJ then asked the VE to consider Dr. Meneese's mental RFC and Dr. Luck's physical RFC and the work that the plaintiff could perform, and the VE responded that she would be precluded from working. *Id.*

The plaintiff's attorney asked the VE to consider Dr. Luck's 2009 mental Medical Source Statement and the work that the plaintiff could perform, and the VE replied that she would be precluded from working. (Tr. 52-53.) The VE testified that a worker with one arm and one hand could work as a production pace sorter (tr. 54) but that a person assigned the limitation in Dr. Meneese's mental RFC would have some difficulty adjusting

to work as a security systems monitor, garment sorter, and sorter in a production environment. (Tr. 54-55.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on August 24, 2009. (Tr. 10-20.) Based on the record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2009.

2. The claimant has not engaged in substantial gainful activity since April 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: congenital absence of the right arm below the elbow; attention deficit hyperactivity disorder (ADHD); a bipolar disorder; and an anxiety disorder (history of panic attacks) (20 CFR 404.1520(c) and 416.920(c)).

* * *

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

* * *

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a wide range of light exertional work

(lift/carry 20 pounds occasionally and 10 pounds frequently, with no use of the right hand and arm required but with the left hand and manipulative abilities not limited, and stand/walk or sit for 6 out of 8 hours, with postural activities [such as climbing, balancing, stooping, kneeling, crouching and crawling] limited only by a need to avoid climbing ladders, ropes and scaffolds), and with mental functional ability to understand and remember simple and detailed instructions, maintain attention, concentration, persistence and pace, and adapt to changes, albeit with some difficulty, and with social functioning limited by a need to avoid contact with the general public.

* * *

6.       The claimant is capable of performing past relevant work as a cook helper (medium/unskilled as described in the United States Department of Labor's *Dictionary of Occupational Titles* [the DOT], but light/unskilled to low-level semiskilled as the claimant described performing the work [food assembler]); and cashier (light/semiskilled). The cook helper job, as the claimant described performing it, does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

* * *

7.       The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2007 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 12-19.)

# IV.  DISCUSSION

## A.  Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases).  The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999).  Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2008); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do

basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595; *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391.

Even if the plaintiff's impairment does prevent her from doing her past relevant work, if

other work exists in the national economy that the plaintiff can perform, she is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also*

*Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y*

*of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966,

969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation

process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v.*

*Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step

two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step four of the five-step process.

(Tr. 18.) At step one, the ALJ found that the plaintiff had not engaged in substantial gainful

activity since April 1, 2007, the alleged onset date of disability. (Tr. 12.) At step two, the

ALJ found that the plaintiff's congenital absence of the right arm below the elbow, ADHD,

bipolar disorder, and anxiety disorder were severe impairments. *Id.* At step three, the ALJ

determined that the plaintiff's impairments, either singly or in combination, did not meet

or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1. (Tr. 15.) At step four, the ALJ concluded that the plaintiff was able to perform her past relevant work as a cook's helper and cashier. (Tr. 18.)

The ALJ also included an alternative step five finding in her decision, determining that even if the plaintiff could not perform her past relevant work, she could perform light level work as a garment sorter and production sorter and sedentary level work as a security systems monitor. (Tr. 18-19.)

### C. The Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred by not giving proper weight to the medical opinions of the plaintiff's treating physician[24] and by not calling a medical expert ("ME") to testify at the hearing as to whether she met Listing 12.04. Docket Entry No. 14, at 7-13. She also argues that the ALJ erred by finding her to be not entirely credible and in relying on GAF scores to conclude that she had only moderate mental limitations. Docket Entry No. 14, at 13-18. The plaintiff further contends that the ALJ denied the plaintiff disability benefits because of her age and erred in improperly applying and disregarding the VE's testimony. Docket Entry No. 14, at 18-20.

---

[24] The plaintiff raised the ALJ's failure to assign controlling weight to Dr. Luck's medical opinions and his failure to consider Dr. Luck's Listing 12.04 form as separate issues, but the Court has combined both issues and addressed them in the same section.

## 1. The ALJ properly assessed the medical opinions of the plaintiff's treating physician.

The plaintiff contends that the ALJ erred in not giving controlling weight to Dr. Luck's medical findings, specifically his physical RFC and mental Medical Source Statement, and in failing to consider Dr. Luck's Listing 12.04 form. Docket Entry No. 14, at 7-11, 13. Given the regularity with which Dr. Luck examined the plaintiff (tr. 381-401, 488-505) he is classified as a treating source under 20 C.F.R. §§ 404.1502 and 416.902.[25] Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is

---

[25] A treating source, defined by 20 C.F.R. § 416.902, is
your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

"well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010); *Hensley v. Astrue*, 573 F.3d 263 (6th Cir.2009). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

The ALJ did not assign controlling weight to Dr. Luck's physical RFC and mental Medical Source Statement. (Tr. 13, 15.) Specifically, the ALJ accorded "no weight" to Dr. Luck's physical RFC and mental Medical Source Statement because both evaluations were not supported by the record medical evidence. *Id.*

As the plaintiff correctly points out, even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 30 (6th Cir. Aug. 19, 2009) (citing *Wilson*, 378 F.3d at 544); *Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *Brock v. Comm'r of Soc. Sec.*, 2010 WL 784907, at *2 (6th Cir. Mar. 8, 2010). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)), and so that the plaintiff understands the disposition of his case. *Wilson*, 378 F.3d at 544 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).

The ALJ focused on the factors of supportability and inconsistency in assigning no weight to Dr. Luck's physical RFC and mental Medical Source Statement. (Tr. 13, 15.) In discussing Dr. Luck's physical RFC, the ALJ explained that

> [a]s will be established in discussing the [plaintiff's] wide range of daily activities hereinafter, limiting lifting/carrying to as a little as 5 pounds is not supported by the record as a whole. The weight of the evidence also fails to support finding that there is any physical cause that would reasonably result in excessive absenteeism. Consequently, . . . the October 17, 2007, physical assessment from Dr. Luck [is] unsupported and accorded no weight in this decision . . . .

(Tr. 13.)  Dr. Luck and three consultative DDS physicians, Dr. Johnson, Dr. Moore, and Dr. Ryan, all completed physical assessments on the plaintiff. (Tr. 351-52, 373-84, 414-21.) Dr. Luck opined that the plaintiff should never lift or carry anything, that she would likely miss work "[m]ore than four times a month," that she needs to be able to "sit in a recliner or lie down" for one hour in an eight hour workday, and that she was markedly limited in her activities of daily living (tr. 381-84); Dr. Johnson found that the plaintiff could occasionally lift only five pounds with her left upper extremity and that her ability to sit/stand was not restricted (tr. 351-52); and Dr. Moore and Dr. Ryan both determined that the plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, that her ability to push/pull was unlimited, and that she had no limitations with her left upper extremity.  (Tr. 374-78, 414-21.)

Dr. Luck's physical RFC is the most restrictive evaluation in the record since he concluded that the plaintiff was unable to lift anything. (Tr. 381-84.)  Although Dr. Luck's lift/carry restriction is similar to Dr. Johnson's determination that the plaintiff could lift/carry only five pounds occasionally, it differed greatly from that of Dr. Moore and Dr. Ryan, who determined that she could lift/carry 20 pounds occasionally. (Tr. 374-78, 414-21.)  Dr. Moore and Dr. Ryan also noted that the plaintiff's left upper extremity had no limitations and that her ability to push/pull was not limited. *Id.*

Besides Dr. Luck's physical RFC being the most restrictive in the record and inconsistent with two other evaluations, as discussed *supra*, it is also not supported by his own medical findings. The plaintiff was born with a congenital right upper extremity deficiency, making her ability to lift/carry largely dependent on her left upper extremity. However, in Dr. Luck's treatment notes, both before and after his physical RFC, there is no indication that she was diagnosed with or treated for an upper left extremity impairment that would limit her ability to lift/carry. (Tr. 387-401, 492-505.) Dr. Luck did diagnose the plaintiff with pain in her left knee, neck, back, and right scapula, all of which could conceivably affect her ability to lift/carry, but x-rays of her left knee, lumbar region, and right shoulder were normal. (Tr. 406-07, 506.)

The Court empathizes with the plaintiff and the limiting effect that her right upper congenital extremity deficiency has on her ability to work. However, the plaintiff performed several jobs with that impairment (tr. 27-28, 171), and, as the ALJ noted, the record does not contain objective medical evidence that the plaintiff suffered from an additional significant physical impairment that would affect her ability to lift/carry, cause her to be absent from work "[m]ore than four times a month," or require her to "sit in a recliner or lie down." (Tr. 15, 381-82.) Finally, Dr. Luck's physical RFC was not supported by the plaintiff's activities of daily living. The plaintiff reported that she cares for her three young children, shops for groceries, and is able to perform housekeeping activities, such

as mopping, dusting, vacuuming, cleaning bathrooms, preparing simple meals, and doing laundry. (Tr. 30-31, 191-96, 248, 250-51.)

The limitations Dr. Luck assigned to the plaintiff in his physical RFC were not supported by his own treatment notes, were inconsistent with the findings of Dr. Moore and Dr. Ryan, and were unsupported by the plaintiff's daily activities. The ALJ provided "good reasons," as required by Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)), for according no weight to Dr. Luck's physical RFC (tr. 15) and substantial evidence in the record supports that determination.

The ALJ also focused on the factors of supportability and inconsistency in assigning no weight to Dr. Luck's mental Medical Source Statement. (Tr. 18.) The ALJ related that Dr. Luck's Medical Source Statement is

> refuted by the mental health treatment records from [VBHCS], to whom he had yielded mental health treatment and medication management. The [VBHCS] treatment records show that the [plaintiff] did better from a mental health standpoint after her prescriptions were changed from those made by Dr. Luck, which endorses his decision to substantially withdraw from the [plaintiff's] mental health treatment. His pessimistic opinion is also inconsistent with his own treatment records, which do not remotely suggest marked to extreme mental functional limitations. Therefore, Dr. Luck's medical source statement of June 17, 2009 with regard to the [plaintiff's] mental functional limitations is also accorded no weight in this decision.

(Tr. 15.) Dr. Luck and consultative examiners Dr. Lambert and Dr. Joslin all diagnosed the plaintiff with bipolar disorder, anxiety/panic disorder, and ADHD, and completed mental evaluations on the plaintiff. (Tr. 285-89, 381-400, 422-38, 488-89.)

Dr. Luck opined that the plaintiff was extremely limited in her ability "to make judgments on complex work-related decisions;" was markedly limited in her ability to make judgments on simple work-related decisions, in her ability to understand, remember, and carry out complex instructions, in her ability to interact appropriately with supervisors, co-workers, and the public, and in her ability to respond appropriately "to usual work situations and to changes in a routine work setting;" and was mildly limited in her ability to understand, remember, and carry out simple instructions. (Tr. 488-89.) In contrast, Dr. Lambert and Dr. Joslin concluded that the plaintiff's mental impairments only slightly/mildly to moderately limited her mental activities and her ability to function, with the one exception being her ability to interact with other people/the general public, which Dr. Lambert and Dr. Joslin found was severely/markedly limited. (Tr. 288, 437.) Dr. Luck's Medical Source Statement was the most restrictive mental evaluation in the record and it did not align with the findings of the other two evaluators.

Even Dr. Luck's own treatment notes fail to show that the plaintiff was suffering from extreme mental limitations since, as the ALJ notes, his treatment of her mental impairments "often involved prescribing mild tranquilizers" for "transient increases of situational stress, such as in October 2007 when he prescribed Valium after her car caught fire." (Tr. 14, 386-413, 491-510.) Additionally, Dr. Luck largely removed himself from treating the plaintiff's mental impairments in the year leading up to his Medical Source

Statement, which further undercuts the credibility of that assessment. On May 1, 2008, the plaintiff presented to VBHCS for treatment for her bipolar disorder, anxiety disorder, and ADHD, and she reported that Dr. Luck wanted her "to start seeing a counselor." (Tr. 450.) Over the next thirteen months, Dr. Luck examined the plaintiff on multiple occasions (tr. 491-99), until he completed his Medical Source Statement on June 17, 2007, but he only once diagnosed the plaintiff with anxiety (tr. 493) or bipolar disorder during that time. (Tr. 491.)

During that same period of time, VBHCS treatment notes indicate that although the plaintiff canceled/missed multiple appointments (tr. 467-70, 472, 482-83, 485), she reported that her mood had improved and that she was less irritable (Tr. 457) and her therapy was not adjusted or changed since "no risk factors [were] present to warrant a change in service intensity." (Tr. 484.) From December of 2008 through May of 2009, the plaintiff did not receive treatment from VBHCS. (Tr. 484-87.) On June 15, 2009, two days before Dr. Luck issued his Medical Source Statement, the plaintiff returned to VBHCS and reported that she was "starting to have anxiety and mood swings" (tr. 459) but that her symptoms were mild and did not "particularly interfer[e]" with her ability to function (tr. 445), and that she was not depressed. (Tr. 459.)

The limitations Dr. Luck assigned to the plaintiff in his Medical Source Statement were not supported by his own treatment notes, were inconsistent with the assessments

of Dr. Lambert and Dr. Joslin, and were unsupported by the plaintiff's therapy at VBHCS. The ALJ also complied with Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)), by providing "good reasons" for awarding no weight to Dr. Luck's mental evaluation, *see* tr. 18, and substantial evidence in the record supports that determination.

Finally, the plaintiff contends that the ALJ failed to consider Dr. Luck's Listing 12.04 form. Docket Entry No. 14, at 13.  The plaintiff is correct in arguing that the ALJ never addressed Dr. Luck's Listing 12.04 form by name in her decision. Docket Entry No. 14, at 7-8.  The Court also appreciates the effort exhibited by both parties, through the filing of multiple Sur-Reply briefs, to address this issue.  Docket Entry Nos. 21, 23, 26, 29, 32.

Since Dr. Luck is a treating physician, the ALJ must provide good reasons for the weight she assigned to his Listing 12.04 form and those reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)), and so that the plaintiff understands the disposition of his case. *Wilson*, 378 F.3d at 544 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).   The Sixth Circuit has plainly stated that a reversal and remand of a denial of benefits is warranted, even if the record may contain substantial evidence that supports the Commissioner's decision, when the ALJ fails to provide good reasons for

discounting the medical opinion of the plaintiff's treating physician. *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. April 28, 2010) (citing *Wilson*, 378 F.3d at 544). The failure to follow the "the procedural requirement 'of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Friend*, 375 Fed. Appx. at 551 (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir.2007)). *See also Wilson*, 378 F.3d at 546 ("A court cannot excuse the denial of a mandatory procedural protection simply because . . . there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely.").

However, the Sixth Circuit has also determined that there are circumstances when noncompliance with the good reasons requirement is "harmless error," if: "'(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;' (2) 'if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;' or (3) 'where the Commissioner has met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation.'" *Friend*, 375 Fed. Appx. at 551 (quoting *Wilson*, 378 F.3d at 547). Should the third situation occur, "the procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency

with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments." *Friend*, 375 Fed. Appx. at 551 (citing *Nelson v. Comm'r of Soc. Sec.*, 195 Fed.Appx. 462, 470-72 (6th Cir. Aug. 26, 2006); *Hall v. Comm'r of Soc. Sec.*, 148 Fed.Appx. 456, 464 (6th Cir. Sept. 2, 2005)). The function of the good reason requirement is to provide clarity and transparency to the reviewing body and, more importantly, to the plaintiff, but it is not a "procrustean bed" that requires "an arbitrary conformity at all times." *Friend*, 375 Fed. Appx. at 551.

Dr. Luck noted in the Listing 12.04 form that the plaintiff's depression was characterized by "[a]nhedonia or pervasive loss of interest in almost all activities," appetite and sleep disturbance, "[p]sychomotor agitation or retardation," "[d]ecreased energy," "[f]eelings of guilt or worthlessness," and "[d]ifficulty concentrating or thinking;" that her manic syndrome was characterized by hyperactivity, "[p]ressure of speech," "[f]light of ideas," and being distracted easily; and that she has "[b]ipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndrome." (Tr. 384.) Dr. Luck also opined that she was markedly limited in her activities of daily living, in her ability to maintain social functioning, and in her ability to maintain concentration, persistence and pace, and found that she had "4+" repeated episodes of decompensation.[26] (Tr. 384.)

---

[26] Dr. Luck did not provide any details of four or more episodes of decompensation nor do his treatment notes reflect such episodes.

There is nothing in Dr. Luck's Listing 12.04 form that is "'patently deficient'" and the ALJ did not "adopt[] the opinion of the treating source or make[] findings consistent with the [Dr. Luck's] opinion," but the ALJ did indirectly attack Dr. Luck's findings via her analysis of Dr. Joslin's PRTF. (Tr. 15-16); *Friend*, 375 Fed. Appx. at 551 (citing *Nelson*, 195 Fed. Appx. at 470-72; *Hall*, 148 Fed. Appx. at 464). First, the ALJ found, "consistent with Dr. Joslin's opinion," that the plaintiff was only mildly restricted in her ability to perform daily activities since she takes care of her three children, carries her children with "her good left arm," and does the following household chores: mopping, dusting, vacuuming, cleaning bathrooms, simple meal preparation, laundry, and grocery shopping. (Tr. 16, 432.) Next, the ALJ concluded that the plaintiff was moderately limited in her ability to function socially and with regard to her concentration, persistence, and pace, and she noted that both of those determinations were consistent with Dr. Joslin's findings. (Tr. 16.) Lastly, the ALJ noted that the plaintiff did not have a "history of significant decompensations" (*id*), which also aligns with Dr. Joslin's PRTF. *Id.*

The ALJ's determination as to whether the plaintiff met a Listed Impairment, specifically Listing 12.04, directly contravenes the findings made by Dr. Luck in his Listing 12.04 form. The Court does not take the ALJ's failure to specifically address Dr. Luck's Listing 12.04 form lightly, but the ALJ did indirectly weigh Dr. Luck's Listing 12.04 form via her adoption of Dr. Joslin's PRTF and her discussion of why the plaintiff did not satisfy

the requirements for Listing 12.04. (Tr. 16.)  This satisfies the third prong of *Wilson's*

harmless error provision and provides the requisite transparency for the plaintiff to

understand why the ALJ determined she did not meet Listing 12.04.

### 2.  The ALJ did not err by not calling a medical expert to testify at the plaintiff's hearing.

The plaintiff contends that the ALJ "failed to properly develop the case as an ME

should have been called to testify regarding whether the Plaintiff meets or equals Listing

12.04." Docket Entry No. 14, at 11-12.  The ALJ has "'the ultimate responsibility for

ensuring that every [plaintiff] receives a full and fair hearing. . . .'" *Simpson v. Comm'r of*

*Soc. Sec.*, 344 Fed. Appx. 181, 189 (6th Cir. Aug. 27, 2009) (quoting *Lashley v. Sec'y of Health*

*and Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983).  *See also Kendrick v. Shalala*, 998 F.2d

455, 458 (7th Cir.1993) ("[h]ow much evidence to gather is a subject on which district courts

must respect the Secretary's reasoned judgment").  In carrying out this responsibility, the

Regulations provide the ALJ with considerable discretion, rather than a mandate, in

deciding whether to seek testimony from a ME.  20 C.F.R. §§ 404.1527(f)(2)(iii) and

416.927(f)(2)(iii) ("Administrative law judges may also ask for and consider opinions from

medical experts on the nature and severity of your impairment(s) and on whether your

impairment(s) equals the requirements of any impairment listed in appendix 1 to this

subpart."). *See Simpson*, 344 Fed. Appx. at 189 (citing *Davis v. Chater*, 104 F.3d 361, 1996 WL 732298, at *2 (6th Cir. Dec. 19, 1996).

The plaintiff notes that Social Security Ruling 96-6p ("SSR 96-6p)

> requires an updated medical opinion when either (1) there is evidence of symptoms, signs and findings that suggest to the ALJ or Appeals Council that the applicant's condition may be equivalent to the listings; or (2) when additional evidence is received that in the opinion of the ALJ or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment does not equal the listings.

Docket Entry No. 14, at 11. However, the above passage to which the plaintiff cites is an excerpt of a broader section of SSR 96-6p that discusses the role of the ALJ and the ME. Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3-4 (July 2, 1996). Under the section addressing the medical equivalency to a Listed Impairment, SSR 96-6p provides that

> [t]he administrative law judge or Appeals Council is responsible for deciding the ultimate legal question whether a listing is met or equaled. As trier of the facts, an administrative law judge or the Appeals Council is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments. . . .
>
> The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) or SSA-832-U5 or SSA-833-U5 (Cessation or Continuance of Disability or Blindness) ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review. Other documents, including the Psychiatric Review Technique Form and various other documents on which medical and psychological consultants may record their

findings, may also ensure that this opinion has been obtained at the first two levels of administrative review.

When an administrative law judge or the Appeals Council finds that an individual s [sic] impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant. However, an administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances:

> When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or

> When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

*Id.* (Footnote omitted.)

In this case, the plaintiff argues that since it is unclear "how the ALJ made the ultimate determination that [she] did not meet Listing 12.04" and that Dr. Luck, her treating physician, completed a Listing 12.04 form indicating that she met Listing 12.04, the ALJ should have deferred to a ME's medical opinion. Docket Entry No. 14, at 11. She points to the first prong of the two prong exception in SSR 96-6p that requires an ALJ to obtain testimony from an ME, contending that "there was evidence of symptoms, signs and

findings that obviously suggested to the ALJ that the Plaintiff's condition was equivalent to Listing 12.04." Docket Entry No. 14, at 12.

The wording of the section of SSR 96-6p to which the plaintiff cites is convoluted and it can be easily misinterpreted. The requirement that the ALJ "obtain an updated medical judgment from a medical expert" is not a mandate but is predicated upon the ALJ's discounting the medical findings of state agency medical or psychological consultants with the intent of concluding that the plaintiff equals a Listed impairment based on "the symptoms, signs, and laboratory findings" in the record. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4.

The Sixth Circuit has not been consistent in its analysis of whether an ALJ is required to solicit the testimony of a medical expert. In *Retka v. Comm'r of Soc. Sec.*, 70 F.3d 1271, 1995 WL 697215, at *2 (6th Cir. Nov. 22, 1995), the Sixth Circuit noted that "[g]enerally the opinion of a medical expert is required before a determination of medical equivalence is made," but in later decisions in *Davis* and *Simpson*, the Sixth Circuit noted that the Regulations give the ALJ discretion in deciding whether or not to call a medical expert. *Simpson*, 344 Fed. Appx. at 189; *Davis*, 104 F.3d 361, 1996 WL 732298, at *2. Further, in *Kelly v. Comm'r of Soc. Sec.*, 314 Fed. Appx. 827, 830-31 (6th Cir. Feb. 2, 2009), the Sixth Circuit found that SSR 96-6p "govern[ing] the need for updated expert medical opinions," requires an update when "there is evidence of symptoms, signs, and findings that *suggest to the ALJ*

*or Appeals Council* that the [plaintiff's] condition may be equivalent to the listings . . . ." (Emphasis added.) Thus, the Sixth Circuit's position seems to be that testimony from a medical expert for an equivalency determination is required if (1) the ALJ or Appeals Council, after reviewing the evidence of symptoms, signs, and findings, is inclined to conclude that the plaintiff's condition may be equivalent to the Listings or (2) the ALJ or Appeals Council, after reviewing additional medical evidence, determines that the new evidence may change the State agency medical or psychological consultant's finding that the plaintiff's impairment(s) do not equal a Listing. *See Kelly*, 314 Fed. Appx. at 830.

In this case, the ALJ assigned significant weight to the findings of consultative DDS examiner Dr. Joslin, including her PRTF, in determining that the plaintiff's impairments did not meet or equal Listing 12.04. (Tr. 15-16.) There is no indication in the ALJ's decision, after reviewing the record evidence, that she was inclined to find that the plaintiff's condition was equivalent to the Listings. Since the "evidence of symptoms, signs and findings" never suggested to the ALJ that the plaintiff's impairments equaled the Listings and Dr. Luck's Listing 12.04 form is not "additional medical evidence" and was available to Dr. Joslin when she completed her PRTF, thus eliminating the possibility that it would change her findings, the ALJ was not required to obtain medical expert testimony under either prong of the section of SSR 96-6p. *Kelly*, 314 Fed.Appx. at 830; Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4.

### 3. The ALJ did not err in analyzing the plaintiff's subjective complaints of pain.

The plaintiff alleges that the ALJ did not properly evaluate or assess the credibility of her subjective complaints of pain. Docket Entry No. 14, at 13-16. The ALJ found that the plaintiff's

> medically determinable impairments could reasonably be expected to cause some of the alleged symptoms . . . . [but that] the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. They are refuted by the objective medical evidence and inconsistent with the wide range of daily activities.

(Tr. 17.)

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision on credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the [plaintiff] and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the [plaintiff]'s complaints as incredible, [she] must clearly state [her] reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider

the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. The ALJ must explain her credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. *Id.*

Both the Social Security Administration ("SSA") and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. See 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[27] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Hash v. Comm'r of Soc. Sec.*, 309 Fed.Appx. 981, 990 (6th Cir. Feb. 10, 2009) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir.1997); *Felisky*, 35 F.3d at 1039). The second prong has two parts: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the

---

[27] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n. 2.

alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

There is objective evidence of underlying medical conditions: the plaintiff has a congenital right upper extremity deficiency (tr. 295, 352) and was diagnosed with ADHD, a bipolar disorder, an anxiety disorder (tr. 289, 355-63, 381, 384, 387-390, 396-401, 423-24, 427, 456, 458-60, 491, 499-505), and knee, back, and right shoulder pain. (Tr. 396-400, 491, 493-94, 496.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of

pain, an ALJ must review the entire case record in light of the seven factors set forth in

20 C.F.R. § 404.1529(c)(3).[28]

In making her credibility determination, the ALJ relied on the plaintiff's "wide range

of daily activities," her prescribed medication, and the objective medical evidence. (Tr. 17.)

First, as discussed *supra*, the plaintiff reported that she cares for her three young children,

shops for groceries, and is able to do housekeeping activities, such as mopping, dusting,

vacuuming, cleaning bathrooms, preparing simple meals, and doing laundry. (Tr. 30-31,

191-96, 248, 250-51.) The plaintiff contends, in relying on *Walston v. Gardner*, 381 F. 2d 580,

586 (6th Cir. 1967), that the ALJ erred in discounting her credibility due to "the fact that she

has been able to perform some activity on a very minimal basis." Docket Entry No. 14, at

15. However, as the defendant points out, the plaintiff's reliance on *Walston* is misplaced.

Docket Entry No. 19, at 28. The factual circumstances of plaintiff in *Walston* differs

significantly from that of the plaintiff in this case. The plaintiff in *Walston* suffered trauma

---

[28] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily
activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other
symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness
and side effects of any medication the plaintiff takes or has taken to alleviate pain or other
symptoms, (v) treatment, other than medication, plaintiff received or has received for relief
of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or
other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour,
sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations
and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

in an automobile accident and he was repeatedly diagnosed with and treated for a lower back/spinal impairment that resulted in significant amounts pain. *Walston*, 381 F. 2d at 586.

In *Walston*, the Court did find that simply because a plaintiff "can still perform simple functions, such as driving, grocery shopping, dish washing and floor sweeping" does not mean that he can engage in substantial activity, but only after the Court found that the plaintiff's testimony that he suffered from intense pain was "confirmed by every doctor who examined him."*Id.* The Court in *Walston* also noted that "[a] man is disabled within the meaning of the Act, if he can engage in substantial gainful activity only by enduring *great* pain." *Id.* (Emphasis added). In this case, however, the plaintiff's subjective complaints of pain were not confirmed by physicians who examined her and she never reported having great amounts of pain when performing her daily activities.

Next, the plaintiff's prescribed medications largely controlled her mental impairments and belied their alleged severity. From June of 2005 to May of 2008, Dr. Luck treated the plaintiff for her mental impairments, but, as the ALJ found, his treatment "often involved prescribing mild tranquilizers" for "transient increases of situational stress, such as in October 2007 when he prescribed Valium after her car caught fire." (Tr. 14, 386-413, 491-510.) The plaintiff reported that her prescribed medication helped her mood and made her less irritable (tr. 457), and testified that her employment at Olive Garden ended because she became depressed after going "off" her medication. (Tr. 30-31.)

Additionally, the plaintiff's treatment history at VBHCS undercuts the severity of her alleged mental impairments: she canceled or missed multiple appointments (tr. 467-70, 472, 482-83, 485), her therapy was not changed since "no risk factors [were] present to warrant a change in service intensity (tr. 484), and when she returned to VBHCS in June of 2009, after four months of no therapy, she reported that she was "starting to have anxiety and mood swings" (tr. 459) but that her symptoms were mild and did not particularly interfere with her ability to function. (Tr. 445.) Finally, the alleged severity of the plaintiff's physical impairments were not supported by the objective record medical evidence. Although Dr. Luck did diagnose the plaintiff with pain in her left knee, neck, back, and right scapula, x-rays of her left knee, lumbar region, and right shoulder were normal. (Tr. 406-07, 506.)

In sum, there is substantial evidence in the record supporting the ALJ's determination that the plaintiff's subjective complaints of pain are not disabling. Further, the ALJ complied with Social Security Ruling 96-7p and with 20 C.F.R. §§ 404.1529 and 416.929 in making that determination by expressly indicating that she relied on the plaintiff's reported activities of daily living, her prescribed medication, and the objective record medical evidence.

**4. The ALJ properly considered the plaintiff's GAF scores as one factor, among many, in determining that she had moderate mental limitations.**

The plaintiff argues that the ALJ incorrectly relied on her GAF scores in concluding that she has moderate mental limitations and that the ALJ should not consider GAF scores when determining her mental limitations. Docket Entry No. 14, at 16-18.  The plaintiff contends that the "ALJ repeatedly noted that the Plaintiff had been assigned GAF scores of 55 and 60" and that "[s]he stated that these GAF scores indicated moderate symptoms." Docket Entry No. 14, at 16.

Even though a GAF score is not dispositive in determining an individual's mental RFC, it can be helpful in assessing an individual's mental RFC. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 n.7 (6th Cir. Feb. 9, 2006) (quoting DSM-IV-TR 34 (4th ed. 2000)).  *See also Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. Sept. 7, 2007); *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411, 415 (6th Cir. Dec. 15, 2006). As explained in *Kornecky*,

> GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. At the low end, GAF 1-10 indicates "[p]ersistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain personal hygiene or serious suicidal act with clear expectation of death."  At the high end, GAF 91-100 indicates "[s]uperior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."  A GAF score may help an ALJ assess mental RFC, but it is not raw medical data.  Rather it allows a mental health professional to turn medical signs and symptoms into a

general assessment, understandable by a lay person, of an individual's mental functioning.

167 Fed. Appx. at 503 n.7 (quoting DSMV-IV-TR at 34) (internal notations omitted).

The plaintiff is correct in pointing out that the ALJ repeatedly noted that examining medical professionals assigned her a GAF score of 55, which indicated that she had "moderate" symptoms. (Tr. 14.) However, in evaluating the plaintiff's functional mental limitations the ALJ did not rely exclusively on her GAF scores. (Tr. 18) The ALJ only mentioned the plaintiff's GAF scores in reporting which medical professional assigned her a certain GAF score (tr. 14), and briefly in addressing whether she met a Listed impairment. (Tr. 16.) The ALJ did not specifically consider the plaintiff's GAF scores when she evaluated the plaintiff's functional limitations. Instead she relied on the plaintiff's daily activities, the pain relief provided by prescribed medication, and Dr. Ryan's and Dr. Joslin's medical findings in assessing the plaintiff's functional limitations. (Tr. 18-19.)

*Kennedy*, cited by the plaintiff, is factually different from this case. *See* 247 Fed. Appx. at 766. In *Kennedy*, the ALJ concluded that an increase in the plaintiff's GAF scores from 55 to 60 "'reflect[ed] improvement in mental functioning' and the Commissioner point[ed] to the current score of 60 as an 'improved GAF.'" *Id.* However, the Court of Appeals noted that a GAF score "may help an ALJ assess mental RFC" but that "it is not raw medical data" and has "no 'direct correlation to the severity requirements of the mental disorders listings.'" *Id.* (quoting *DeBoard*, 211 Fed. Appx. at 415). Specifically, the Court found that

the ALJ erred in determining that the plaintiff's GAF score increase from 55 to 60 indicated a significant improvement in his mental functioning since the scores of 55 and 60 both reflect "moderate symptoms or moderate difficulty in social, occupational or school functioning" on the GAF scale. *Id.* *Kennedy* does not stand for the complete rejection of GAF scores or that an ALJ should never consider GAF scores; rather it requires ALJs to significantly temper their reliance on GAF scores, given their limited utility, and to use other substantial evidence in the record as support for their functional limitation determinations. *Id. See also Smith v. Astrue*, 565 F. Supp. 2d 918, 925 (M.D. Tenn. 2008) (Wiseman, J.) ( "In sum, the GAF score, alone, cannot discredit [a treating physician's] assessment of [the] Plaintiff's limitations . . . .").

Although the ALJ recited the GAF scores that medical evaluators assigned the plaintiff (tr. 14) and briefly referred to them in her analysis of whether the plaintiff met a Listed impairment (tr. 16), she did not rely exclusively on them in assessing the plaintiff's mental functional limitations. (Tr. 17-18.) Instead, the ALJ relied on the plaintiff's daily activities, the pain relief provided by her prescribed medication, and Dr. Ryan's and Dr. Joslin's medical findings, and thus did not err in concluding that the plaintiff's mental limitations were moderate.

### 5. The ALJ was not biased by the plaintiff's age.

The plaintiff contends that the ALJ "denied the Plaintiff [disability] based on her age, rather than based on the medical evidence in the record." Docket Entry No. 14, at 18-19. In support of her argument, the plaintiff notes that at her hearing the ALJ told the plaintiff's attorney to "[t]alk to [her] . . . because you know what I'm concerned about on this case, don't you? Her age, per se. I mean major concern, okay?" Docket Entry No. 14, at 18; tr. 33.

The Sixth Circuit applies the "'presumption that policymakers with decisionmaking power exercise their power with honesty and integrity,' and 'any alleged prejudice must be evident from the record and cannot be based on speculation or inference.'" *Carrelli v. Comm'r of Soc. Sec.*, 390 Fed. Appx. 429, 436-37 (6th Cir. July 23, 2010) (quoting *Navistar Int'l Transp. Corp. v. U.S. EPA*, 941 F.2d 1339, 1360 (6th Cir.1991)). Additionally, "any claim of bias must be supported by a 'strong showing' of bad faith." *Carrelli*, 390 Fed. Appx. at 436-37 (quoting *City of Mount Clemens v. U.S. EPA*, 917 F.2d 908, 918 (6th Cir.1990)).

Besides the brief two line statement made by the ALJ at the beginning of the plaintiff's hearing, she makes no other reference to the plaintiff's age and gives no indication that she is "biased" by the plaintiff's age at either the hearing or in her decision. (Tr. 10-57.) In fact, the ALJ conducted an extensive hearing in which she asked the plaintiff questions, allowed plaintiff's counsel to question his client, and posed the VE numerous

hypotheticals to the VE. (Tr. 22-57.)  Further, the ALJ did not base her decision on the

plaintiff's age but rather on Dr. Joslin's and Dr. Ryan's medical findings, treatment notes

from VBHCS, the effect of the plaintiff's prescribed medications, and the daily activities

that the plaintiff reported. (Tr. 12-17.)  In sum, the ALJ made one statement regarding the

plaintiff's age but this statement fails to provide a "strong showing" of bad faith or bias by

the ALJ, especially since the record shows that the ALJ gave full and fair consideration to

the plaintiff's disability allegations.[29] *Carrelli*, 390 Fed. Appx. at 436-37 (quoting *City of*

*Mount Clemens v. U.S. EPA*, 917 F.2d 908, 918 (6th Cir.1990)).


**6. The ALJ erred in finding that the plaintiff's job as a cook's helper was past relevant work, but she properly relied on the VE's testimony in determining, at step five, that the plaintiff could still perform work as a garment sorter, production sorter, and security system monitor.**

The plaintiff contends, albeit with little discussion, that the ALJ "disregarded" the

VE's responses to seven of the hypotheticals that were posed to her and erred in concluding

that the plaintiff was not disabled. Docket Entry 14, at 19.  The Regulations allow ALJs to

rely on a VE at step five to determine whether a plaintiff is able to perform any work. 20

C.F.R. § 404.1560(c).  The VE's testimony, in response to an ALJ's hypothetical question,

---

[29] The Court acknowledges that the ALJ's comment about the plaintiff's age was gratuitous, particularly given the fact that she did not explain why she raised that concern. However, it appears that plaintiff's counsel had an opportunity to seek further clarification of the ALJ's remark or potentially further explication that her remark might have stemmed from any bias, but he failed to do so.

will be considered substantial evidence "'only if that [hypothetical] question accurately portrays [the plaintiff's] individual physical and mental impairments.'" *White v. Comm'r of Soc. Sec.*, 312 Fed. Appx. 779, 785 (6th Cir. Feb. 24, 2009) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir.1987)). *See also Anderson v. Comm'r of Soc. Sec.*, 2010 WL 5376877, at *3 (6th Cir. Dec. 22, 2010) (citing *Felisky*, 35 F.3d at 1036) ("As long as the VE's testimony is in response to an accurate hypothetical, the ALJ may rely on the VE's testimony to find that the [plaintiff] is able to perform a significant number of jobs."); *Colvin v. Barnhart*, 475 F.3d 727, 732 (6th Cir. 2007) (quoting *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir.2001)) ("A vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments."). Although a hypothetical must accurately portray a plaintiff's impairments, an ALJ "is required to incorporate only those limitations that [she] accepts as credible." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (quoting *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993)).

The ALJ relied on Dr. Ryan's physical RFC and Dr. Joslin's PRTF in making the plaintiff's RFC determination. (Tr. 18.) When the ALJ asked the VE to review Dr. Ryan's physical RFC and Dr. Joslin's PRTF, the VE answered that the plaintiff could do her past work as a cook's helper but not as a cashier, and that she could work as a security systems

monitor, garment sorter, and production sorter. (Tr. 49-50.) As discussed *supra*, Dr. Ryan's and Dr. Joslin's findings are supported by substantial evidence in the record, thus, the ALJ properly relied on the VE's testimony regarding Dr. Ryan's and Dr. Joslin's assessments. *White*, 312 Fed. Appx. at 785.

What is confusing, however, is that although the ALJ relied on Dr. Ryan's and Dr. Joslin's assessments (tr. 18), which the VE testified indicated that the plaintiff could not return to her past work as a cashier, and on the VE's testimony in determining what work the plaintiff is able to perform (tr. 18-19), the ALJ ultimately found that she was capable of performing both of her past relevant jobs as a cook's helper and cashier. (Tr. 18.) Plainly stated, since the ALJ relied on Dr. Ryan's physical RFC and Dr. Joslin's PRTF in making her RFC determination, she must also rely on the VE's testimony that, based on those two assessments, the plaintiff would be precluded from performing her past work as a cashier. (Tr. 49-50.)

The plaintiff also contends that the ALJ erred in classifying her job as a cook's helper as past relevant work. Docket Entry No. 14, at 19-20. The plaintiff testified that she worked as a cook's helper for "[m]aybe a month or two." (Tr. 53.) Past relevant work is typically defined as "'work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it.'" *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395-96 (6th Cir. 2010) (quoting 20 C.F.R. § 404.1560(b)(1)). In turn,

52

substantial gainful activity is defined as work involving "'significant physical or mental activities' done for 'pay or profit,'" *Wright-Hines*, 597 F.3d at 395-96 (quoting 20 C.F.R. § 404.1572(a)-(b)).

Although the plaintiff does not specifically cite to it, the "unsuccessful work attempt" provision of 20 CFR § 404.1574 is applicable in this case since it provides that "some jobs of short duration will not be considered past relevant work." *Wright-Hines*, 597 F.3d at 395-96 (quoting 20 C.F.R. § 404.1574(c)). If an individual works for three months or less, the Regulations consider that "to be an unsuccessful work attempt if you stopped working, or you reduced your work and earnings below the substantial gainful activity earnings level, because of your impairment or because of the removal of special conditions which took into account your impairment and permitted you to work." 20 C.F.R. § 404.1574(c)(3). *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 219 (6th Cir. Aug. 31, 2010) ("The Appeals Council found that the particular past relevant work considered by the ALJ was only five months in duration and did not generate enough income to be considered 'qualifying past relevant work' under the applicable regulations."); *Wright-Hines*, 597 F.3d at 395-96 ("[The plaintiff's] work as a cashier lasted only two to three months, which is too short to qualify as past relevant work.").

The plaintiff testified that she left her job as a cook's helper, after only working for a month or two, because she "went off [her] medication" and became depressed. (Tr. 30.)

The defendant argues that, even if the plaintiff only performed her job as a cook's helper for a few months, it still qualifies as past relevant work because it only required her to perform simple tasks such as placing silverware on plates, wiping down counters, and lifting plates. Docket Entry No. 19, at 30. However, for individuals who have been employed for three months or less, the Regulations require a much lower burden for their past employment to be classified as an "unsuccessful work attempt" and the plaintiff's job as a cook's helper should be classified as such since she testified that her employment ended after only a month or two because of her depression. 20 C.F.R. § 404.1574(c); (Tr. 30.)

Lastly, the plaintiff argues that, if the plaintiff's cook's helper job is not classified as past relevant work, that determination "would have a great impact on the outcome of this case." Docket Entry No. 14, at 19-20. If the ALJ had stopped her five step analysis at step four and had only concluded that the plaintiff could perform her past relevant work, the plaintiff's argument would carry the day. However, as the defendant points out, the ALJ included an alternate step five finding and concluded that even if the plaintiff could not perform her work as a cook's helper, her assigned RFC allowed her to work as garment sorter, production sorter, and security system monitor. Docket Entry No. 19, at 30-31; tr. 18-19. Further, as required by *White* and as discussed *supra*, since the ALJ relied on the VE's answers to hypotheticals that were supported by substantial evidence in the record, she did not err in making the step five determination that the plaintiff could perform work

as a garment sorter, production sorter, and security system monitor. 312 Fed. Appx. at 785 (quoting *Varley*, 820 F.2d at 779.)

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 13) be DENIED, that the ALJ's step five determination that the plaintiff could still perform substantial gainful activity should be AFFIRMED, and that this action be DISMISSED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

_____
JULIET GRIFFIN
United States Magistrate Judge